1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

2

DALLAS DIVISION

3

UNITED STATES OF AMERICA,      )   **Case No. 3:13-cr-00446-B-1**
                               )   (Mag. No. 3:13-mj-706-BH)

4

          Plaintiff,           )
                               )   Dallas, Texas

5

v.                             )   October 30, 2013
                               )   2:00 p.m.

6

WAYNE JOSEPH SWEENEY,          )
                               )   DETENTION HEARING

7

          Defendant.           )   PRELIMINARY HEARING
                               )
_____

8

9

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE RENEE HARRIS TOLIVER,
UNITED STATES MAGISTRATE JUDGE.

10

11

APPEARANCES:

12

For the Government:          George Leal
                             UNITED STATES ATTORNEY'S OFFICE
                             U.S. DEPARTMENT OF JUSTICE

13

                             1100 Commerce Street, Third Floor
                             Dallas, TX  75242-1699

14

                             (214) 659-8600

15

For the Defendant:           Larry Finstrom
                             LAW OFFICE OF LARRY FINSTROM

16

                             Renaissance Building
                             1201 Elm Street, Suite 2510

17

                             Dallas, TX  75270
                             (214) 748-5855

18

19

For the Defendant:           Carl Randall Day
                             LAW OFFICE OF CARL R. DAY
                             2121 W. Airport Freeway, Suite 210

20

                             Irving, TX  75062
                             (972) 870-0816

21

Court Recorder:              Angela French

22

                             UNITED STATES DISTRICT COURT
                             1100 Commerce Street, Room 1611

23

                             Dallas, TX  75242-1003
                             (214) 753-2169

24

25

```
1   Transcription Service:        Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (940) 498-2402
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25        Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
```

1              DALLAS, TEXAS - OCTOBER 30, 2013 - 2:31 P.M.

2          THE COURT:  The Court calls Case No. 3:13-mj-206-BH

3    [sic], United States of America versus Wayne Joseph Sweeney.

4    And this case is set for detention and preliminary hearing this

5    afternoon.

6        Mr. Leal, are you ready to proceed?  Sorry.

7              MR. LEAL:  Yes, Your Honor.

8              THE COURT:  Okay.

9              MR. LEAL:  I apologize.

10             THE COURT:  That's okay.  And Mr. Finstrom and Mr. Day

11   have entered appearances for Mr. Sweeney since we were in court

12   last.  And are you gentlemen ready to proceed?

13             MR. FINSTROM:  We are, Your Honor.

14             THE COURT:  Okay.  Mr. Leal?

15             MR. LEAL:  Your Honor, the Government calls Richard

16   Gardner.

17        (The witness is sworn.)

18             THE COURT:  You may proceed, sir.

19              RICHARD GARDNER, GOVERNMENT'S WITNESS, SWORN

20                        DIRECT EXAMINATION

21   BY MR. LEAL:

22   Q    Agent Gardner, would you state your name for the record,

23   please?

24   A    Richard Gardner.

25   Q    And where do you work?

1   A    In Dallas, Texas.

2   Q    And what do you do in Dallas, Texas for a living?

3   A    I'm a Special Agent with the Drug Enforcement

4   Administration.

5   Q    And how long have you been a special agent with the Drug

6   Enforcement Administration?

7   A    Nearly 17 years.

8   Q    I want to turn your attention to a person by the name of

9   Wayne Joseph Sweeney.  Do you see a person that you recognize

10  by that name in the courtroom here today?

11  A    Yes, sir, I do.

12  Q    Would you point that person out and identify that person by

13  an article of clothing that he or she is wearing, as well as

14  where that person is either sitting down or standing?

15  A    It's the individual at the defense counsel table to the

16  right-hand side, in the orange attire.

17          MR. LEAL:  Your Honor, may the record reflect the

18  witness has identified the Defendant?

19          THE COURT:  The record will so reflect.

20  BY MR. LEAL:

21  Q    Agent Gardner, in regards to Mr. Sweeney, I want to turn

22  your attention specifically to a case involving him that

23  occurred back on about September 13th in Dallas County, Texas

24  in the Northern District of Texas.  Are you familiar with the

25  facts of that particular case?

1  A    Yes, sir.

2  Q    And would you talk to the Court or tell the Court how it

3  was that that particular case got started?

4  A    The actual case started last year in late fall, an

5  investigation regarding the sales of synthetic cannabis from

6  his business location on LBJ and Jupiter Road, known as Hostile

7  Pipes.

8  Q    And did the case involve a number of people?

9  A    Yes, sir, it did.

10  Q    Both known and unknown?

11  A    Absolutely.

12  Q    Does the case involve some folks out in Arizona?

13  A    Yes.  It involves individuals there that were manufacturing

14  synthetic cannabis as well as bath salts.

15  Q    Okay.  And does it also involve some folks in Indiana?

16  A    Yes, sir, it also does, for manufacturers of synthetic

17  cannabis there.

18  Q    And does it also involve other folks?

19  A    Yes, sir.

20  Q    And you're talking about synthetic cannabis.  Are you

21  talking about controlled substances?

22  A    Yes, sir.  It is a controlled substance.

23  Q    And specifically, a controlled substance analogue?

24  A    Analogue in this case.

25  Q    Okay.  And would you tell the Court what you came to find

1  out in this particular case?

2  A   Following the undercover purchases of a product known as K

3  or Knock Out from Mr. Sweeney's business location, these

4  products were tested by the DEA South Central Laboratory here

5  in Dallas and they were found to contain a product known as PB

6  22 and 5F-PB 22 in the samples purchased.  And these are

7  recognized by DEA as analogues --

8  Q   Okay.

9  A   -- of controlled substances.

10  Q   And specifically, are they Schedule I controlled

11  substances?

12  A   Yes, sir, they are.

13  Q   And you said that that particular substance was made

14  through an undercover purchase?

15  A   Yes.  Multiple purchases.

16  Q   Okay.  And in regards to this particular substance, would

17  you tell the Court what it was that you learned about who was

18  receiving it and how it was being distributed?

19  A   Learned that Mr. Sweeney was receiving these products both

20  from -- previously from Arizona as well as from the state of

21  Indiana from manufacturers, and that he would distribute --

22  package and distribute these products from his location, a

23  store named Hostile Pipes here in Dallas, Texas.

24  Q   And did you learn how he would distribute and package these

25  particular substances?

1  A    Yes.  He had two packages: one large, one small.  And they

2  were colored blue or pink.  There was no label upon them, but

3  they were referred to by the sales personnel as either KO or

4  Knock Out.

5  Q    Okay.  And these particular substances, were you able to

6  talk to some of the folks that worked at Mr. Sweeney's place of

7  business?  I think you called it Hostile Pipes.

8  A    Yes, sir.

9  Q    And is that located here in the Northern District of Texas?

10 A    Yes, sir, it is.

11 Q    In the Dallas Division?

12 A    Yes, sir, it is.

13 Q    And when you talked to those folks at Mr. Sweeney's

14 business there at Hostile Pipes, what did they tell you as far

15 as how the substances arrived and how they were packaged

16 subsequently?

17 A    They arrived in a bulk format, loosely.  Mr. Sweeney would

18 bring those into the business.  They would take it back to the

19 back area of the store, where he would have the employees

20 package the product in either pink or blue Ziploc baggies.

21 These baggies would then be counted out to approximately 100 in

22 a bag.  You would have the 100 of each, place those under one

23 side of the store at the cash register, and the customers would

24 come in there and purchase them.

25 Q    Okay.  And did they give you a time frame as to about how

1   long this had gone on?

2   A    For the employees that had been there since -- since the

3   store had opened, as far as they knew, and a couple of years.

4   Q    Okay.  And so I want to kind of start back at the beginning

5   for a little bit with the Arizona distribution, was that going

6   on at that point in time?

7   A    Yes, sir, it was.

8   Q    At some point in time -- and what was the name of that

9   Arizona distributor?

10  A    That was called Greenlight Distribution.

11  Q    Were you able to look at financial documents and receipts

12  that were being sent back and forth between Mr. Sweeney and

13  Greenlight Distributing?

14  A    Yes, sir, we were.

15  Q    And would you tell the Court what it was you found out of

16  those?

17  A    Well, what we found is the documentation of the purchases

18  made by Mr. Sweeney of the products that they manufactured and

19  the payments for the transportation or shipment of those

20  products.

21  Q    And what did the payments amount to?  Just roughly?

22  A    At a time, I believe, $20,000, $30,000, $40,000 at a time.

23  He was purchasing a large quantity.  This was not a small

24  amount for distribution.

25  Q    Okay.  At some point in time, did that Greenlight

1   Distributing company get shut down?

2   A    Yes.  It was the subject of another DEA investigation

3   taking place in the Phoenix area, and they were the subject of

4   a search warrant.

5   Q    Okay.  After that particular location was shut down, did

6   Mr. Sweeney gain a different supplier?

7   A    Yes, sir, he did.

8   Q    And what supplier did he gain?

9   A    We believe it was WSW, located in just, uh, Indianapolis,

10  Indiana.

11  Q    And what leads you to believe that?

12  A    Well, through coordination with other officers from the

13  DEA, Indiana State Police and Homeland Security, they conducted

14  an investigation there and recently did a search warrant where

15  they recovered documentation regarding the customers that they

16  supplied.  Additionally, when we conducted our search warrant,

17  we found documentation related to his purchases from WSW.

18  Those included checks and Federal Express shipping labels.

19  Q    Okay.  And from those documents that you looked at, were

20  you able to determine approximately more or less how much

21  product Mr. Sweeney was receiving on a monthly basis?

22  A    He was probably -- from what we can tell, close to 80

23  pounds, 40 kilos, around there, more or less every month.

24  Q    And were you able to tell how much money he was paying for

25  the product?

1   A    About $40,000 to $60,000.

2   Q    Okay.  And at some point in time, did those folks -- I

3   think you mentioned Homeland Security earlier and the Indiana

4   State Police -- did the folks up in Indiana get shut down?

5   A    Yes, sir.  They've been taken -- there's -- they've stopped

6   production at this time.

7   Q    Okay.  And subsequent to that, were you able to tell

8   whether or not Mr. Sweeney was able to -- let me ask you this.

9   When did they get shut down?

10  A    Approximately two weeks ago.

11  Q    Okay.  Have you been able to determine if Mr. Sweeney had

12  other suppliers?

13  A    We believe at least one, possibly two other suppliers.

14  Q    Okay.  In regards to Mr. Sweeney, were you able to, in your

15  investigation, were you able to determine how much money he was

16  making?

17  A    On a yearly basis?

18  Q    On a yearly basis.

19  A    Well in excess of $1 million.

20  Q    Okay.  And have you been able to look at financial records

21  from the Hostile Pipes business and is that money basically

22  where -- has -- the money you just quoted, is that where the

23  money came from?

24  A    Yes, sir.  The majority of his income was generated through

25  sales of synthetic cannabis through his business, Hostile

1    Pipes.

2    Q    And there's the purchase that was made on or about

3    September 13th of 2013 here in Dallas in the Northern District

4    of Texas.  Did -- and that's what was tested and came back

5    positive as an analogue controlled substance?

6    A    Yes, sir, as well as the subsequent purchase I believe the

7    27th of September.

8    Q    Okay.  Of this year?

9    A    Yes, sir.  And the results were the same.

10   Q    Okay.  And then was there a purchase in March of 2013 as

11   well?

12   A    Yes, sir, there was.

13   Q    And has that been tested?

14   A    It's been sent to the lab.  We have not received a result

15   for that.

16   Q    Okay.  In regards to Mr. Sweeney, did you learn whether or

17   not he had any assets outside of the country?

18   A    Yes, sir, we did.

19   Q    And will you tell the Court what type of assets he has

20   outside the country?

21   A    He has real property, consists of at least one home, if not

22   a home and a condominium, in Cancun, Mexico.  He also has at

23   least one bank account in Mexico.

24   Q    Okay.  And how were you able to find this information?

25   A    We learned this through the issuance of grand jury

1    subpoenas.

2    Q    Okay.  And in regards to the bank account that you're

3    talking about, have you been able to look to see how much money

4    has been deposited into that bank account over the course of

5    time?

6    A    From our forensic accounting, we believe at least $3.2

7    million.

8    Q    And at some point in time, did Mr. Sweeney get arrested?

9    A    Yes, sir.

10   Q    And when he got arrested, did -- was anything found in his

11   possession that would indicate another link to this particular

12   account?

13   A    Yes, sir.

14   Q    And would you tell the Court what that was?

15   A    On I believe the 16th of this month, he was stopped by the

16   Department of Public Safety Highway Patrol in Hopkins County,

17   and at that time he was found to be in a large -- in possession

18   of a large amount of currency.

19   Q    Okay.

20   A    He also had a money counter with him.

21   Q    Okay.  Do you know about how much money he had with him?

22   A    I believe it was $297,000.  Something like that.  Just shy

23   of $300,000.

24   Q    All right.  And you said he had a money counter with him?

25   A    Yes, sir.

1  Q    Did you ever at any point in time find any bank cards in

2  reference to that account in Mexico?

3  A    Yes, sir.  He had an HSBC ATM-style card, and he also had

4  an HSBC credit card.

5  Q    And are those cards in his name?

6  A    Yes, sir.

7  Q    And you also mentioned the property that he had in Mexico,

8  and you said it was -- it was two houses or --

9  A    We believe at least two, two types of real property.

10  Q    Okay.  In looking at Mr. Sweeney, in looking at his travel

11  habits, were you able to determine if he spends time in the

12  United States and Mexico as well?

13  A    He spends a large amount of time in Mexico.

14  Q    And would you tell the Court how you were able to find that

15  out?

16  A    We documented that through the course of our investigation

17  with Homeland Security, HSI, and Immigration Control.  We also

18  documented that through the grand jury subpoenas and contacts

19  with the airline industry.  We also documented that through the

20  interviews of numerous employees as well as acquaintances.

21  Q    And in regards to Mr. Sweeney, did you also find travel

22  documents that supported that?

23  A    Yes, sir, we did.

24  Q    And would you tell the Court what type of travel documents

25  you found that supported that?

1  A   We found a United States passport with frequent entries and

2  exits from the United States into and out of Mexico.  We also

3  found a Mexican temporary resident card, as well as another

4  travel document.  These were all co-located with his passport.

5  Q   In regards to Mr. Sweeney, were you ever able, through the

6  course of your investigation, were you ever able to make a

7  determination as to where his residence was?

8  A   His true residence?

9  Q   Yes.

10  A   He -- both he and acquaintances freely admit that he

11  resides in Mexico.  In regards to his true residence in the

12  United States, we are unsure at this time.

13  Q   And why is that?

14  A   Well, he has listed the business as his residence, but when

15  we conducted the search warrant at the business location, we

16  found no living quarters there: a bed, shower facilities,

17  things of that matter that would indicate that someone was

18  actually living there.

19  Q   Okay.

20  A   We do know about a renting of a hotel room, but minimal

21  personal goods were found there to indicate someone was

22  actually living there long-time.

23  Q   In regards to real property in the United States, does --

24  are there any residences listed for Mr. Sweeney?

25  A   Not in his name.

1  Q    And what do you mean by that?

2  A    He has recently purchased two pieces of real property.  One

3  of those is a residential home in the county just north of here

4  in Collin County or Denton County, Texas.  The other is I

5  believe in Carrollton in Dallas County.

6  Q    Okay.

7  A    Both of those are listed in his girlfriend's name.

8  Q    All right.  And in regards to those particular pieces of

9  property, did y'all through the course of this investigation,

10 did y'all ever go out and try and ascertain if he was living at

11 either one of those locations?

12 A    Yes, sir, we did.

13 Q    And would you tell the Court what it was that you found?

14 A    At the Carrollton property, it's a building being

15 rehabilitated right now.  So it's unlivable.  In regards to the

16 property in the county, we spoke with his girlfriend and

17 learned that he doesn't stay at that location.  He has been

18 there once to look at it and that is that.

19 Q    Okay.  And the property in The Colony, how was that

20 purchased?

21 A    It was purchased with a cashier's check for $173,000.

22 Q    Let me ask you this.  At some point in time, a search

23 warrant was executed at Hostile Pipes; is that right?

24 A    Yes, sir.

25 Q    And was that on or about October 16th of 2013?

1   A    Yes, sir.

2   Q    Would you tell the Court what was found whenever you all

3   executed that particular search warrant?

4   A    We found, I believe, just in excess of two kilograms of

5   synthetic cannabis and approximately seven kilograms of

6   suspected synthetic cathinones or bath salts as well as a large

7   amount of currency and what we would consider drug ledgers and

8   financial documents.

9   Q    Okay.  You said you found synthetic cathinones, which are

10  also bath salts.  Are those also controlled substances?

11  A    Yes, sir, they are.

12  Q    Are they analogue controlled substances?

13  A    Yes, sir.

14  Q    In regards to the drug ledgers and financial instruments,

15  did that go in line with the investigation that you conducted?

16  A    Yes, sir, it is.

17  Q    And then at some point in time were you also able to talk

18  to some of the folks that worked there?

19  A    Yes, sir, we did.

20  Q    And did they tell you how long they'd been selling the

21  product?

22  A    In excess of two years.

23  Q    And while you were there, were there also people even then

24  lining up to try and purchase some?

25  A    Yes.  From the time the store opened, they have a regular

1   -- visits of clients.  They're in there a very short time, just

2   to make the purchases.  And the ones walking up that spoke with

3   us said that they were there to purchase KO or Knock Out.

4   Q   And did you ask any of the employees whether or not they

5   knew what kind of effect this had on their customers?

6   A   Yes, sir, we did.

7   Q   And what did they tell you?

8   A   The employees who we spoke with who said they had never

9   used the product themselves reported that the customers had

10  said that it was a very good product, it provided a great buzz,

11  and one of them said -- one of the customers had said, you

12  probably shouldn't use it, though, because there's some severe

13  withdrawal symptoms.

14  Q   In regards to Mr. Sweeney, you talked about how he had been

15  pulled over I think in Hopkins County; is that right?

16  A   Yes, sir.

17  Q   At some point in time, were his phones searched after he

18  was arrested?

19  A   Yes, sir.

20  Q   And did -- was anything found on those phones?

21  A   Yes, sir, there was.

22  Q   And would you tell the Court what was found?

23  A   We found some pictures of cashier's checks and FedEx

24  shipping labels to WSW, the manufacturer of synthetic cannabis

25  in Indiana.  We also found a picture, looks like it was taken

1   on a table, with very large cannabis or marijuana buds placed

2   upon it.  We also found a picture of himself smoking what

3   appeared to be some type of marijuana or synthetic cannabis

4   cigarette or joint.

5   Q   Okay.  Were you all able to find any voice recordings or

6   voicemails or anything like that?

7   A   Yes, sir, we did.

8   Q   And would you tell the Court what you found?

9   A   We found what we believe to be the recordings of push-to-

10  talk conversations from his side of the phone to individuals in

11  Mexico.

12  Q   And --

13  A   This was detailing transfers of money.

14  Q   Okay.  And were you ever able to find anything talking

15  about sending more good stuff down?

16  A   Yes, sir, we did.

17  Q   And would you tell the Court what the nature of that

18  conversation was?

19  A   That appeared to -- there was conversation regarding the

20  quality of product, improving the taste or flavor because

21  customers were complaining.  And then other conversations on a

22  different time and place -- or different date where it seemed

23  to be that he was -- the product was selling well and that he

24  wanted more of it.

25          MR. LEAL:  Pass the witness, Your Honor.

 1          THE COURT:  Whichever one of you gentlemen is going to

 2   cross-examine.

 3          MR. FINSTROM:  I will, Your Honor.  May it please the

 4   Court?

 5          THE COURT:  Yes, sir.  Go right ahead.

 6                         CROSS-EXAMINATION

 7   BY MR. FINSTROM:

 8   Q    Officer Gardner, how much of your work involves

 9   investigating head shops?

10   A    At this time, sir?

11   Q    Yeah.

12   A    The majority of it.

13   Q    And you're an experienced officer when it comes to how head

14   shops operate; is that correct?

15   A    No, sir.

16   Q    Would it be fair to say that it's your experience that a

17   lot of the reason we have head shops is for people to try to

18   sell analogue substances to mimic illegal substances to avoid

19   the drug laws?

20   A    I don't know exactly.  I would say this, that I've noticed

21   recently, at least within the last year to 18 months, a

22   proliferation of head shops, smoke shop type businesses, that

23   seem to be thriving because of the sales of synthetic cannabis.

24   Q    And when you executed the search warrant on this head shop,

25   there were a substantial number of analogue-type substances you

1  did not seize; is that correct?

2  A    That -- I believe we seized all of the synthetic cannabis

3  that we found there as well as the synthetic cathinones.  I

4  don't --

5  Q    Maybe I'm not asking it correctly, but there were various

6  other products that are similar type head shop products that

7  you did not seize; is that correct?

8  A    We didn't seize any of the pipes that I believe -- or the

9  smoking paraphernalia regarding that.

10  Q    Now, there was an entire glass case of various other

11  substances that were for sale that were not seized by you;

12  isn't that correct?

13  A    Are you referring to the electronic cigarette products?

14  Q    And others.

15  A    I know there was also cigarettes and pipe or loose tobacco.

16  We didn't seize that, either.

17  Q    But there's a whole line of analogue-type substances that

18  are sold in head shops; is that correct?

19  A    There may be.  I'm trying to recall the inside of that

20  location.  If you can tell me perhaps where, I might be

21  familiar with that.  I do recall that there, you know, there

22  was the synthetic cannabis that was seized from below the cash

23  register area.  There was also the loose synthetic cannabis

24  that was near his office in the back, as well as the packaged

25  synthetic cathinones that were back over near the office area.

1  But I'm not exactly sure where you're speaking about.

2  Q   I've never been there so I -- my understanding is the way

3  it was described to me is that there were sale -- glass sales

4  counters, and in the counters where you could observe them

5  there were a lot of substances for sale, one of which was this

6  cannabis that you determined was illegal.  And you're saying

7  that's incorrect?

8  A   No.  I'm not saying that's incorrect.  I'm trying to think

9  about the products other than the loose tobacco, the

10  cigarettes, those type of products, as well as the electronic

11  cigarette products that weren't seized.  And then there were

12  other items like pipes and rolling papers and head shop

13  paraphernalia like posters or decals or koozies.  But I don't

14  remember anything else that might have been an analogue that

15  wasn't seized.

16  Q   Okay.  Now, when was this particular analogue made illegal?

17  A   When was it made illegal?

18  Q   Yeah, this particular -- this cannabis analogue that you

19  seized in --

20  A   I believe -- I believe it falls under the Drug Control Act

21  as an analogue, and I believe it's 1986 was the analogue

22  statute.

23  Q   But it's my understanding that the way the statute works is

24  that the head shops try to buy new and different products that

25  fall outside the statute and then the statute is amended to

1  include those products to make them illegal.  Is that an unfair

2  thing to say?

3  A   Yes, sir, I think it would be.  I believe, you know, that

4  the qualifications are the similar synthetic -- the similar

5  chemical structure, the purported or the mimicking of the --

6  how do I want to describe it -- the effects of the product, as

7  well as the intention of the sale of them.

8  Q   Now, there were zanny bars in there that were for sale that

9  were not seized by the Government; is that correct?

10         THE COURT:  What was that word you said?

11         MR. FINSTROM:  Zanny.  Z-A-N-N-Y.

12         THE WITNESS:  That may be.  I don't recall ever seeing

13  those products.

14  BY MR. FINSTROM:

15  Q   Are you familiar with it?

16  A   No, sir, I'm not.

17  Q   And that's an analogue -- so you're not aware if it's an

18  analogue substance that's similar to Xanax?

19  A   It may be.  I have never seen that product or even heard of

20  that product until now.

21  Q   Kratom capsules.  K-R-A-T-O-M.  Did you see any of those in

22  there?

23  A   I did not see any of those.

24  Q   Kratom liquid.  Same spelling.  Did you see any of that in

25  there?

1   A    No, sir, I did not.

2   Q    Speedies?

3   A    I didn't see those.

4   Q    Are you familiar with any of those?

5   A    I've heard of the kratom products before in a different

6   investigation.

7   Q    Are they illegal?

8   A    I don't know.

9   Q    Okay.  Now, as a part of your investigation, you determined

10   when these undercover sales were made that they were rung up on

11   the cash register; is that correct?

12   A    I believe they were.

13   Q    And there are business records reflecting the purchase of

14   the bulk products which was sold?

15   A    We did find records.

16   Q    Okay.  And are you aware of his tax records, that he

17   reported over a million dollars in taxes last year?

18   A    I have not personally seen them, but I know he had

19   mentioned those.

20   Q    Okay.  And in reviewing his financial records in the store,

21   there was a recent $150,000 tax payment to the IRS.  Did you

22   see that payment?

23   A    I did not personally see that, sir.

24   Q    Are you familiar with that?  Did other people --

25   A    I've heard that mentioned.

1    Q    By the Government or by Wayne?

2    A    By Mr. Sweeney.

3    Q    Okay.  You haven't heard anybody in the Government say that

4    he had just made a $150,000 tax payment?

5    A    No, sir, I did not.

6    Q    He's asserted to you that he believed at the time he sold

7    this stuff it was legal; is that correct?

8    A    Yes, sir.

9    Q    I think at the time of the seizure there were various

10   chemists' information which comes along with the wholesale

11   purchases, where there's representations from the manufacturer

12   about the legality of the product.  Is that correct?

13   A    Depending on the product and the laboratory reports that

14   are provided.  Some of them make that claim.

15   Q    And there were claims regarding this product, that this

16   product was legal; is that correct?

17   A    I had examined one of the laboratory reports.  I don't

18   remember if it exactly said that, sir.

19   Q    The money that was seized when he was arrested, he told

20   y'all what he was using the money for; is that correct?

21   A    He didn't tell me, but I believe he told the Department of

22   Public Safety officers.

23   Q    And he told them that he was on his way to make a -- buy a

24   -- make a down payment on a ranch; is that correct?

25   A    Either a down payment or a final payment.

1   Q    So he was purchasing real estate with money; is that

2   correct?

3   A    That's what I understand.  Yes, sir.

4   Q    Now, Wayne has listed that shop as his residence for a

5   fairly lengthy period of time; is that correct?

6   A    I believe for a period of time.  Yes, sir.

7   Q    And it was listed as his residence when he was on parole

8   from his last criminal offense; is that correct or are you

9   aware?

10  A    I believe it was.

11  Q    And he was visited there by his parole officer and the

12  parole officer determined at that time it actually was his

13  residence, didn't he?

14  A    I don't know.  I never spoke with the parole officer.

15  Q    Are you aware that the City of Dallas kicked him out of

16  there, wouldn't allow him to live there, and that's when he

17  moved to the hotel across the street?

18  A    No, sir.  I didn't know that.

19  Q    The one house that he purchased, he purchased a house for

20  his girlfriend that he had a child with; is that correct?

21  A    That's what I understand.

22  Q    And she's repaying him for the money that he purchased the

23  house; is that correct?

24  A    She's made one payment.

25  Q    One payment?  She just -- he just bought the house?

1   A    According to the lady, yes.

2   Q    The second house is in the process of being remodeled; is

3   that correct?

4   A    That's what I understand.

5   Q    What was the name of the customer that had withdrawal

6   symptoms?

7   A    I don't know.  The sales clerk didn't tell me that.

8   Q    What steps has the DEA taken to make head shops aware that

9   this particular synthetic cannabis is illegal?

10          MR. LEAL:  Objection.  Relevance.

11          THE COURT:  Sustained.

12   BY MR. FINSTROM:

13   Q    Are you aware of anything that's been done by the

14   Government to post -- put Wayne Sweeney on notice that the sale

15   of this substance was illegal?

16          MR. LEAL:  Objection.  Relevance.

17          THE COURT:  Overruled.

18          THE WITNESS:  Has the Government made any -- could you

19   say that again so I understand, sir?

20   BY MR. FINSTROM:

21   Q    Are you aware of any attempt the Government has made to put

22   Wayne Sweeney on notice that the sale of this synthetic

23   analogue is illegal?

24   A    I don't believe the Government has personally informed Mr.

25   Sweeney prior to this time that it was illegal.

1  Q   Are you aware of them making any other head shop aware of

2  it?

3  A   Any other head shops?

4  Q   Yeah.

5  A   Yes, sir.

6  Q   What steps do they take?

7  A   They stop selling the product.

8  Q   And is there any indication you have that you had made

9  Wayne aware of the fact that this was illegal, that he would

10 not have stopped selling the product?

11 A   Well, what I meant by letting them know, they -- it was

12 subsequent to a search warrant and arrest that we performed at

13 those locations.

14 Q   Say that one more time.  I lost you in the middle of it.

15 A   We notified them when we conducted search warrants and

16 arrest warrants of the owners and operators of those locations.

17 Q   And when was that?

18 A   Mostly this year.

19 Q   And you told them that this substance was illegal?

20 A   Yes, sir.

21 Q   You personally?

22 A   Face-to-face.

23 Q   Okay.  Now, and you've seized substantial business records,

24 both showing the sale and the purchase of these various

25 analogue substances; is that correct?

1  A    Yes, sir.

2           MR. FINSTROM:  I don't believe we have any further

3  questions, Your Honor.

4           MR. LEAL:  Just very quickly, Your Honor.

5                        REDIRECT EXAMINATION

6  BY MR. LEAL:

7  Q    When Greenlight Distributing was shut down, were they

8  selling the same type of product that the company from Indiana

9  is selling?  Basically?

10 A    Yes, sir.

11 Q    Synthetic cannabis?

12 A    Yes, sir.

13 Q    How much money was Mr. Sweeney sending the folks out in

14 Arizona, Greenlight Distributing?

15 A    Hundreds of thousands of dollars overall.

16 Q    Okay.  And when that got shut down, did he switch to

17 another distributor?

18 A    Yes, sir.

19 Q    Did -- how much money was he sending to that distributor?

20 A    Tens of thousands of dollars.

21 Q    Okay.

22           MR. LEAL:  Pass the witness.

23           MR. FINSTROM:  We have no further questions, Your

24 Honor.

25           THE COURT:  Thank you, sir.

1      (The witness steps down.)

2           THE COURT:  Mr. Leal?

3           MR. LEAL:  Your Honor, the Government asks the Court

4    to take judicial notice of the Pretrial Services report.  The

5    Government rests.

6           MR. FINSTROM:  Your Honor, if I can address the

7    Pretrial Services report, and then I have a couple of

8    witnesses.

9           THE COURT:  Okay.  Do you want to save that for

10   argument or --

11          MR. FINSTROM:  Well, it's kind of -- there is an

12   allegation in the presentence report that Wayne is a sex

13   offender.

14          THE COURT:  Who did not register.  Yes, I read that.

15          MR. FINSTROM:  And Carl represented him on one

16   registration case.  Carl and I represented him on the second

17   registration case.  Both of those -- or, one was no-billed, one

18   was dismissed.  He was convicted in '68 in Wisconsin for

19   consensual underage sex, and at the time of that conviction

20   there was no sex registration statute in Wisconsin.

21          THE COURT:  Did you say in '68?

22          MR. DAY:  '89.

23          MR. FINSTROM:  I'm not looking at it.

24          MR. DAY:  Or '81.

25          MR. FINSTROM:  '89.  I'm sorry.

1          THE DEFENDANT: '81.

2          MR. DAY: '81.

3          MR. FINSTROM: '81. And at the time he was convicted

4    -- that's what it is. He was convicted in '81. The sex

5    registration statute was not passed until a later date. The

6    Wisconsin sex registration statute has a 15-year cap on it.

7    So, 15 years after the conviction, there's no further

8    registration requirement. At this time in state of Texas, that

9    statute is not listed on the SORA list with the Department of

10   Public Safety, and there's a threshold before there's a

11   registration requirement that the offense be listed as a

12   similar offense to a state -- a Texas state offense before

13   there is a requirement to register. And we've been in active

14   contention over whether the fact Wayne Sweeney is required to

15   register. And it's my belief that at this time there is no

16   requirement in the state of Texas that he register. We have

17   two pending expunctions on the arrests for the failure to

18   register. We're beginning litigation with DPS in Austin to

19   remove him from the sex offender list because he's not listed

20   on the SORA list as a reportable offense.

21       And I think there has been a finding by Judge Snipes in the

22   last dismissal -- and I don't have it with me but I

23   participated in preparing it; it was signed by Judge Snipes --

24   where he made a finding which was substantially similar to

25   that, that there is no requirement that he register in the

1  state of Texas.  Despite that, he remains on the registration

2  list, but he's been here and actively contested any legal

3  requirements he has, and I think, given the opportunity, he

4  would stay here and continue to contest them.  If he was found

5  to be required to register, I believe he would register and

6  comply with the requirements.

7      The fugitive case that's referred to, he was at a trade

8  show in Las Vegas, and the fugitive case without disposition

9  was just a means for arresting him in Las Vegas and returning

10  him to Texas.  So that never resulted in any criminal charges.

11  And we'd just ask the Court to consider that, and then we have

12  -- we would call Sherry Thomas.

13      (The witness is sworn.)

14          THE COURT:  Sir, would you mind questioning him from

15  the podium?

16          MR. FINSTROM:  I'm sorry.

17          THE COURT:  Her?  Questioning her from the podium,

18  please?  Thank you.

19          MR. FINSTROM:  I was talking and forgot to get back

20  up, Your Honor.

21          THE COURT:  Okay.

22          SHERRY THOMAS, DEFENDANT'S WITNESS, SWORN

23                      DIRECT EXAMINATION

24  BY MR. FINSTROM:

25  Q   Okay.  Tell the judge your name.

1   A    Sherry Thomas.

2   Q    And how long have you known Wayne Sweeney?

3   A    Fifteen years.

4   Q    Now, you're described in the presentence report-- in the

5   Pretrial Services report as being his girlfriend.  Is that

6   correct?

7   A    Yes.

8   Q    That's how they described me.

9            THE COURT:  Hopefully she doesn't know what it says in

10  the Pretrial Services report --

11           MR. FINSTROM:  Okay.  They --

12           THE COURT:  -- since she's not supposed to see that.

13           MR. FINSTROM:  I think --

14  BY MR. FINSTROM:

15  Q    You don't consider yourself his girlfriend but you did have

16  a child with him; is that correct?

17  A    Yes.

18  Q    And you were called by a Pretrial Services officer and you

19  tried to contact them to provide information about Wayne but

20  you were unable to get them; is that correct?

21  A    Is that Jesse Garza?

22  Q    Excuse me?

23  A    Is that the Jesse Garza?

24  Q    Yeah.

25  A    Yes.

1   Q    Now, how long have you known Wayne?

2   A    Fifteen years.

3   Q    And where does he reside?

4   A    In Cancun.

5   Q    And he also, when he's in Texas, where does he reside?

6   A    In the hotel.

7   Q    And is the hotel right across the street from his place of

8   business?

9   A    I believe so.

10  Q    And he stays there regularly when he's in the United

11  States?

12  A    Yes.

13  Q    Now, he purchased a house for you; is that correct?

14  A    Yes.

15  Q    And you've made an agreement to make repayment for the

16  purchase of the house?

17  A    Yes.

18  Q    And when did that occur?

19  A    In August.

20  Q    And does he care for your child?

21  A    Yes.  Let me correct that.  He didn't purchase the house

22  for me.  He purchased it for our daughter.

23  Q    For your daughter?  And he regularly provides support for

24  the daughter; is that correct?

25  A    Yes.

1   Q    And he provides any support you request for the care of the

2   child?

3   A    Yes.

4   Q    How are you employed?

5   A    I'm a teacher.

6   Q    And where do you teach?

7   A    In Dallas.

8   Q    And how long have you been a teacher?

9   A    Thirteen years.

10  Q    And do you depend on Wayne for those child support

11  payments?

12  A    Yes.

13  Q    Do you believe, if the Court considered releasing him on

14  bond, that he would stay in the United States and face charges?

15  A    Yes.

16  Q    Now, are you aware that when this last case was pending in

17  state court that he regularly made trips back and forth to

18  Mexico but when he was required to be in court in the United

19  States he immediately came up here and appeared?

20  A    Yes.

21  Q    Are you aware of that?

22  A    Yes.

23  Q    And you're aware on short notice that he would get a

24  flight, come up here, and appear in court; is that correct?

25  A    Yes.

1   Q   How much of the month is he working operating his business

2   at the head shop?

3   A   I don't know.

4   Q   You don't know?  But it is an actively-run business?  Do

5   you know how any employees there are there?

6   A   No.

7   Q   It's not a place you've been?

8   A   I've been there a couple of times in the past year, --

9   Q   Okay.

10  A   -- couple years, maybe.  I think there's four or five, but

11  I'm not positive.

12  Q   Okay.

13          MR. FINSTROM:  We have no further questions, Your

14  Honor.

15                          CROSS-EXAMINATION

16  BY MR. LEAL:

17  Q   Ms. Thomas, what's the address on that house in Cancun?

18  A   I don't know.

19  Q   Where else does he stay?

20  A   At the hotel.  Here.

21  Q   Okay.  But you don't know the address of the house in

22  Cancun?

23  A   I don't know the address.

24  Q   Does he go anywhere else in Mexico?

25  A   Not that I know of.

1   Q   Who has access to his Mexican bank account?

2   A   I don't know.

3   Q   Do you have access to his Mexican bank account?

4   A   No.

5   Q   Do you know how much money is in that Mexican bank account?

6   A   No.

7   Q   You said that he bought the house you're living in for his

8   daughter?

9   A   Yes.

10  Q   And when did he buy that house?

11  A   In August.

12  Q   Of this year?

13  A   Yes.

14  Q   And you said you're supposed to pay him back?

15  A   Uh-huh.  Yes.

16  Q   And how many payments have you made to him?

17  A   One.

18  Q   When was that?

19  A   In October.  The first payment.

20  Q   And how much was that?

21  A   $1,000.

22  Q   Is the house in your name?

23  A   Yes.

24        MR. LEAL:  May I have just a moment, Your Honor?

25        (Pause.)

```
 1   BY MR. LEAL:

 2   Q   Do you own another residence or is there another residence,

 3   one that's being remodeled or --

 4   A   Yes.  It's not in Carrollton, though.  It's in Richardson.

 5   Q   Okay.  And who owns that house?

 6   A   It's in my name, but it's Wayne's.

 7   Q   It's in your name but it's his?

 8   A   Uh-huh.

 9   Q   I'm sorry.  You've got to answer yes or no.

10   A   Yes.

11   Q   When did he buy that?

12   A   I don't remember.  May?  I don't remember.

13   Q   May of this year or last year?

14   A   I don't remember for sure.  But maybe a year ago, maybe a

15   little bit less.

16   Q   Okay.  Is that house paid for?

17   A   I believe so.

18   Q   And how much did that house cost?

19   A   I don't know.  I don't -- I don't remember.

20   Q   Okay.  But --

21   A   I've never been there.

22   Q   It's in your name --

23   A   Yes.

24   Q   -- but you've never been there?

25   A   Yes.
```

1   Q   So you don't really own it?

2   A   You asked me whose it was; I said it was his.

3   Q   Right.  And I'm just making sure you --

4   A   Right.

5   Q   -- you don't really own it?

6   A   No.

7   Q   But it's in your name?

8   A   Yes.

9   Q   Why would Mr. Sweeney do that?

10  A   When they were ready to close, he was in Cancun and the

11  house is very convenient to where I work and I could sign the

12  papers easily.

13  Q   It's being remodeled?

14  A   Yes.

15  Q   Who's paying for the remodeling?

16  A   I'm assuming he is.

17  Q   I mean, you're not, right?

18  A   No.

19  Q   Okay.

20  A   No.

21  Q   Is it three-bedroom, two-bath?

22  A   I have no idea.

23  Q   Okay.  Anything else that's in your name that actually

24  belongs to Mr. Sweeney besides those two properties?

25  A   I don't think so.  No.

1              MR. LEAL:  Pass the witness, Your Honor.

2              MR. FINSTROM:  We have no further questions, Your

3    Honor.

4              THE COURT:  Ma'am, you may step down.  Thank you.

5         (The witness steps down.)

6              MR. FINSTROM:  We would call Vindu Chauhan, Your

7    Honor.

8         (The witness is sworn.)

9              VINDU CHAUHAN, DEFENDANT'S WITNESS, SWORN

10                        DIRECT EXAMINATION

11   BY MR. FINSTROM:

12   Q    Now, tell the judge your name.

13   A    Vindu.

14   Q    And how are you employed?

15             THE COURT:  Could you stop just a second, sir?  Would

16   you spell your name, please?

17             THE WITNESS:  V-I-N-D-U.  Vindu.

18             THE COURT:  And is that your complete name?

19             THE WITNESS:  No.  My last name is Chauhan.  C-H-A-U-

20   H-A-N.

21             THE COURT:  Say your last name.

22             THE WITNESS:  C-H-A-U-H-A-N.

23             THE COURT:  H-A-N?  I'm sorry about that.

24             MR. FINSTROM:  I'm sorry.  I butchered it, so there

25   you go.

1          THE COURT:  Well, we've got the electronic recording

2    going.  If we have to make a record, I want to make sure that

3    the court reporter can get that.

4    BY MR. FINSTROM:

5    Q    How are you employed?

6    A    I work as a like responsible person.

7    Q    And you work for Wayne; is that correct?

8    A    Yes.

9    Q    And how long have you worked for him?

10   A    I start work 2008 (indecipherable), and couple months later

11   I quit, then I come back, then again I quit and I come back and

12   I -- this year I came back in March, after March 19.

13   Q    Okay.

14   A    And last year I start September.

15   Q    Total, how long in the period you've been here?

16   A    Probably two and a half years.

17   Q    Okay.  And what duties do you have in your employment?

18   A    What?

19   Q    What do you do for Wayne?

20   A    Oh, I do in the store everything, like taking care, and I

21   am cosigner in his account.

22   Q    Okay.  Now, a substantial part of the store's business is

23   selling these analogue substances to people who want to use

24   them; is that correct?

25   A    Yes, sir.  But I don't have any idea about that part of

1  because I never smoke in my life.

2  Q   Okay.  And I'm not saying that you used them, but that's

3  part of the reason for the store, is to sell them.  Is that

4  correct?

5  A   Yes.

6  Q   How many different kinds of products like that are sold in

7  the store?

8  A   My knowledge, only one kind.

9  Q   There isn't other products that are for sale?

10 A   No.

11 Q   When you say one kind, what are you describing?

12 A   That's like Knock Out.

13 Q   And --

14 A   And other, other item for the smoking, like water pipes,

15 hand pipes, cigarettes, topical.

16 Q   And when I asked the officer about the zanny bars and

17 kratom and speedies, those are not sold in the store?

18 A   Yeah, we sell in the store.

19 Q   And were those seized by the police when they came and --

20 A   No.

21 Q   -- executed their warrant?

22 A   No.

23 Q   And are they still for sale in the store now?

24 A   Yes, sir.

25 Q   Okay.  Now, have you ever had any discussions with Wayne

1   about selling the Knock Out?

2   A    No.

3   Q    Was it your understanding that it was legal?

4   A    Yes, sir.

5   Q    Would you have sold it if it was illegal?

6   A    I don't know.  Because -- because it's legal, that's why

7   Mr. Sweeney sell it.  That's what I know.

8   Q    Yeah.  And he believed it was legal; you believed it was

9   legal?

10  A    Yes, sir.

11  Q    You've stopped selling it now; is that correct?

12  A    Since the -- we have the operation, the search warrant, I

13  never been there to the store.

14  Q    Okay.  Now, at the time when you were in the store and

15  purchases were being made, were they rung up on the cash

16  register?

17  A    Yes.

18  Q    Was there a record made of the purchases?

19  A    End of the day, we have report.

20  Q    And they chronicled all the purchases that had been made in

21  the store for that day.  Is that true?

22  A    Yes.

23  Q    And it included all the Knock Out purchases that were made?

24  What was done with that report?

25  A    It's in the store.  I just write it down, what we have, and

1  that's all.

2  Q   And it's my understanding that that went to a bookkeeper;

3  is that correct?

4  A   Yes.

5  Q   Okay.

6  A   It goes to bookkeeper and Mr. -- CPA.  Eric (phonetic).

7  Q   Did you have authority to write checks for Wayne?

8  A   Yes, sir.

9  Q   How often did you write checks for Wayne?

10  A   When we have like supply comes, I go to buy cigarettes on

11  -- from supply com, water pipes, hand pipes, that kind of

12  stuff.  I -- if I have to write a check.  Otherwise, we have to

13  buy money order sometime.  That's what it is.

14  Q   And there is a record made of those purchases; --

15  A   Yes, sir.

16  Q   -- is that correct?

17  A   Yes.

18  Q   And that's turned over to the bookkeeper?

19  A   Yes, sir.

20  Q   How many employees are there in the store?

21  A   Oh, five.  With me, we are five.

22  Q   And is it your understanding that the store is still open,

23  or is it closed?

24  A   Yeah.  It's still open.

25  Q   Okay.

1          MR. FINSTROM:  We have no further questions, Your

2    Honor.

3                        CROSS-EXAMINATION

4    BY MR. LEAL:

5    Q   Ma'am, you said that you had worked for Mr. Sweeney I guess

6    starting back in 2011?

7    A    Yeah.

8    Q   Okay.  And then you said you quit?

9    A   Means you know like sometime I got upset with something and

10   I go, but it's not from pressure from Mr. Sweeney.  But I quit

11   and I go to another job.  But he trust me a lot, because I work

12   hard.

13   Q   Okay.  All right.  What'd you get upset about?

14   A   You know, sometime you know like something I don't do and

15   he blames to me.  That's why I say, I don't want to do that.  I

16   -- that's all it is.  It's not a pressure or nothing at all.

17   Q   I'm not asking that.  I'm just asking what was it that

18   upset you that made you quit?

19   A   Like another employee does something wrong and comes to me

20   and I'm real kind of, you know, very sensitive person.

21   Q   Okay.

22   A   That's all it is.

23   Q   All right.  So you worked, you quit, came back, then you

24   quit again?

25   A   And come back.

1   Q    Right.  And the second time you quit, was it -- why was

2   that?

3   A    Probably last year, 4/20 of April.  For April 20.

4            THE COURT:  What kind of training did you say?

5            THE WITNESS:  2012.

6            THE COURT:  What kind of training?

7            THE WITNESS:  No, no, no.  I quit last year.

8            THE COURT:  You quit?

9   BY MR. LEAL:

10  Q    Right.  You quit, but why did you quit?

11  A    Oh, one -- oh, one guy, he's trying to talk to Mr. Sweeney,

12  this lady, she's showing your business to sell someone your

13  business.  I say, I don't do that, and why like I -- I don't

14  try to sell his business to someone Indian people.  That's

15  somebody give him wrong information.  And so I said, if you

16  don't trust me, I don't want to work.  I just walk out on the

17  store.  That's what it is.

18  Q    Okay.  So you left Mr. Sweeney because of that?

19  A    Yeah.

20  Q    Okay.  And then you came back?

21  A    And I start working at Sam's and then I came back.  Yes,

22  sir.

23  Q    All right.  There is -- you said that there is a drug,

24  Knock Out, being sold there?

25  A    Yes, sir.

1  Q    The synthetic cannabis?  Okay.  And where did you all have

2  that for sale?

3  A    Under register.

4  Q    I'm sorry.  On the register or under the register?

5  A    Under register.  Right here.

6  Q    Okay.  Could you see it?

7  A    Yeah.

8  Q    Okay.  Could people that come in see it, that it was for

9  sale?

10  A    Just regular customer.  I start work before that, this item

11  is sold, selling.

12  Q    Okay.  But let me ask you this, though.  I go into the

13  store, Hostile Pipes.

14  A    No, you cannot see.

15  Q    Okay.  So I couldn't see it?  Okay.  And you're shaking

16  your head.

17  A    No.

18  Q    Okay.  So if I came into the store, I wouldn't know it was

19  there if I had never been there before and had never bought it

20  before?

21  A    Yeah, customer ask.  It is only we have regular customer.

22  Q    Okay.  How much money was being made from this Knock Out

23  drug?

24  A    I have no idea, but it's like regular sale.  It's like

25  monthly -- I can say, yearly, no more than $1.2 or .3 million

1   yearly.

2   Q    Okay.  $1.2 --

3   A    Or .3 million.

4   Q    -- or $.3 million yearly?

5   A    Uh-huh.  Because all that goes -- goes to CPA.  We don't

6   see the full report.

7   Q    Right.  And you said uh-huh.  Was that a yes?

8   A    Yes.

9   Q    Okay.  All right.  So all this money is being made from

10  this drug that's being sold from under the counter that nobody

11  can see?  In other words, you have to know it's there --

12  A    Uh-huh.

13  Q    -- in order to buy it?

14  A    Uh-huh.

15  Q    Okay.  Let me ask you this.  I mean, that's a lot of money,

16  right?

17  A    It's not for one day's sales, sir.

18  Q    Right.  For a year.

19  A    Uh-huh.

20  Q    That's a lot of money, right?

21  A    Yes, sir.

22  Q    Okay.  So, if you're making that much money, wouldn't it

23  make sense to you that, if you know it's okay, that you just

24  put it out in the open for the whole world to see, so that way

25  maybe you could make twice the money or three times the money?

1  Maybe you could make $10 million a year.

2  A    Sir, I am just an employee.

3  Q    Right.

4  A    Regular employee.  I got paid like you will get paid.

5  Q    Yes, ma'am.  Yes, ma'am.  As a regular person, --

6  A    Uh-huh.

7  Q    -- okay, just a regular person, if you're making $1 million

8  to $3 million a year off of something that's hidden, and let's

9  just say you're a regular person, wouldn't you want to make

10  more money?

11  A    I don't want it.

12  Q    Yeah, but wouldn't you want to make more money?

13  A    Me?

14  Q    Yeah.

15  A    No.  I don't want to make more money.  I don't understand

16  your point.  I really -- I am not seeming all discussions that

17  way.

18  Q    That's fine, ma'am.

19          MR. LEAL:  May I have just one second, Your Honor?

20      (Pause.)

21          MR. LEAL:  Pass the witness.

22                    REDIRECT EXAMINATION

23  BY MR. FINSTROM:

24  Q    Now, ma'am, everything that's sold in the store is locked

25  up and controlled by the employees.  Is that correct?

1    A    Yes.  Always.

2    Q    And so that it's not possible for somebody to just come in

3    the store --

4    A    No.

5    Q    -- and pick up any of the items and take them to the

6    counter?

7    A    Everything is locked up.

8    Q    Okay.  And I think on one -- at least one of the occasions

9    when you left employment, you returned to your home in India.

10   Is that correct?

11   A    Yes.

12   Q    Did you do that on more than one occasion?

13   A    One time, one time my brother was sick, but it's like it

14   was -- this year, I was India for four and a half months.

15   Q    Okay.

16           MR. FINSTROM:  We have no further questions, Your

17   Honor.

18                        RECROSS-EXAMINATION

19   BY MR. LEAL:

20   Q    Do you sell pipes there?

21   A    Yes.

22   Q    If I walk in the door, can I see the pipes?

23   A    Of course.

24           MR. LEAL:  Pass the witness.

25           THE WITNESS:  But it's locked.  Nobody can touch it.

 1          MR. LEAL:  Right.  Pass the witness.

 2          MR. FINSTROM:  My final witness is --

 3          THE COURT:  Ma'am, you may step down.

 4          MR. FINSTROM:  I'm done, Your Honor.

 5      (The witness steps down.)

 6          MR. FINSTROM:  Ryan Burnight.

 7      (The witness is sworn.)

 8          RYAN BURNIGHT, DEFENDANT'S WITNESS, SWORN

 9                    DIRECT EXAMINATION

10  BY MR. FINSTROM:

11  Q    Tell the judge your name.

12  A    Ryan Burnight.

13  Q    And can you spell your last name for me?

14  A    B-U-R-N-I-G-H-T.

15  Q    Okay.  And how do you know Mr. Sweeney?

16  A    I have worked for him for roughly nine months, and I was a

17  customer before then for about I want to say maybe two years.

18  Q    Okay.  Now, are you familiar with the operation of the head

19  shop?

20  A    I am.

21  Q    And you're employed there now?

22  A    I am.

23  Q    Now, does he sell a number of analogue-type products in the

24  store?

25  A    I would -- yes.

1  Q   And the reason people buy those products is to avoid using

2  illegal drugs; is that correct?

3  A   Correct.

4  Q   And that's why there's a market for them?

5  A   Right.

6  Q   Okay.  Did you believe at the time you were selling this

7  Knock Out stuff that it was legal?

8  A   It was, to my understanding, it was 100 percent legal.

9  Q   And you were selling it believing it was legal?

10  A   Correct.

11  Q   And were all purchases that were made in the store, were

12  they chronicled with a business record, with a receipt in the

13  register and a report for the accountant?

14  A   Yes, sir.

15  Q   And what were your duties at the store?

16  A   I was a daily employee, managing the store, taking care of

17  customers, making sure all of the items that were for sale were

18  in stock and looked good, and, you know, daily cleaning and

19  stuff like that.

20  Q   Okay.

21        MR. FINSTROM:  We have no further questions, Your

22  Honor.

23                          CROSS-EXAMINATION

24  BY MR. LEAL:

25  Q   I'm sorry.  Is it Mr. Barnight?

1   A   Burnight.

2   Q   Burnight?  Mr. Burnight, where do you keep that Knock Out?

3   A   It is kept easily accessible behind the counter.

4   Q   Okay.  Behind the counter or under the counter?

5   A   Technically, both.

6   Q   Okay.  Is it where everybody can see it?

7   A   No, but there are various signs posted all over the store

8   labeled -- advertising for a medical marijuana alternative.

9   Q   Okay.  And does it say, buy your Knock Out here?

10  A   No, but --

11  Q   All right.

12  A   -- it does lead people to walk in and refer to the sign and

13  ask about the product that we do have.  When they ask about it,

14  I then show them.

15  Q   So, if I walk in the door, it's not like I know it's there?

16  If I'm the first guy -- if it's my first time in the store, I

17  don't know that product is there?

18  A   You should immediately see the signs.

19  Q   I should immediately know Knock Out is there?

20  A   That some sort of alternative is there, yes.

21  Q   Okay.  But that's not my question.

22  A   Knock Out --

23  Q   The question --

24  A   -- specifically?  No.

25  Q   Okay.  And that's how it's sold, right, is Knock Out?

1  A    Uh-huh.

2  Q    You've got to answer yes or no.

3  A    Yes, sir.

4  Q    And who told you it was legal?

5  A    Mr. Sweeney.

6  Q    Do you know how much money he was making on a monthly basis

7  off of this?

8  A    I did not.  I did not have access to financial records.

9  Q    Okay.  Did you work there every day?

10  A    Six days a week, yes.

11  Q    What were your hours?

12  A    From 6:00 to 2:00.

13  Q    6:00 to 2:00?

14  A    Uh-huh.

15  Q    You've got to answer yes or no.

16  A    Yes, sir.

17  Q    All right.  Is that 6:00 in the evening to 2:00 in the

18  morning?

19  A    Yes, sir.

20  Q    In regards to your hours, how much of your sales during the

21  hours that you worked there came from Knock Out?

22  A    I would say probably 65-70 percent of it.

23  Q    65 to 70 percent?  (Pause.)  What were the other sales?

24  A    The other sales were from tobacco products, hand pipes,

25  water pipes, rolling papers, all the other merchandise that's

1   at the store.

2   Q   How often did you see Mr. Sweeney there?

3   A   Um, off and on.  I would say he spent about 40 percent of

4   his time there while I was employed there.  There was a good

5   stint of time where he was taking care of business outside the

6   country.

7   Q   Where --

8   A   But --

9   Q   And where was that?

10  A   Mexico, as far as I knew.

11  Q   How much time would you say he spent in Mexico?

12  A   I'd probably say about two-three months in a given time.

13  Q   Okay.  Is that he goes there for two or three months and

14  comes back here for a week and then goes back for two or three

15  months, or --

16  A   It's --

17  Q   -- how does that work?

18  A   It wasn't really on a scheduled basis.  I would say he'd be

19  gone two months, back for two-three weeks, gone again, back

20  again.

21  Q   Okay.  So, and when you say gone again, is he gone again

22  for two more months and then comes back?

23  A   (no audible response)

24  Q   I'm sorry?

25  A   Yes.

1  Q    Okay.  And each of those times, do you know where he's

2  going in Mexico?

3  A    I'm assuming to his residence in Cancun.

4  Q    Okay.  Do you know what the address is of that residence?

5  A    I have absolutely no idea.

6  Q    Did you ever have to make any deposits into any accounts?

7  A    No, sir.

8  Q    Who did that?

9  A    I am assuming Vindu.

10 Q    Okay.  When Mr. Sweeney came into town, where did he stay?

11 A    He stayed at the Regency Hotel across the way once the fire

12 marshal told him to kick -- get out of his office back in the

13 back area of the store.

14 Q    Did he have a bed back there?

15 A    He did.

16 Q    Is there a shower in that place?

17 A    There is not, but he has quite a well-equipped sink.

18 Q    Okay.  So he's coming back for two or three weeks at a time

19 when you're --

20 A    No, he still had -- he's had that room at the Regency for a

21 very extended period of time.

22 Q    Okay.  Did he have a bed there at the shop?

23 A    He had a cot.  And a couch.

24 Q    Did you help package the product, --

25 A    I didn't.

1   Q   -- Knock Out?

2   A   I did not.

3   Q   Your job was just sell it?

4   A   Yes.  I was a sales employee.

5   Q   Okay.  Did you have -- did you advertise it or did people

6   just come up and ask for it?

7   A   Well, I mean, people would ask about the medical marijuana

8   alternative signs and I would explain to them that that was

9   referring to the Knock Out.  And it used to be on display in a

10  case and then that case got moved and things got rearranged in

11  the store and it never got re-put on display.

12  Q   It used to be put on -- it used to be on display?

13  A   Yes.  These to be a bag on display inside of the Zippo case

14  advertising that that bag was there.

15  Q   Okay.  When did it stop being displayed?

16  A   Um, --

17  Q   About, if you can remember.

18  A   It happened before I was an employee there.

19  Q   Do you know if that was about the time that Greenlight

20  Distributing in Arizona got shut down?

21  A   I have absolutely no information on (indecipherable) stuff.

22  Q   Okay.  Do you know anything about Greenlight Distributing?

23  A   To my knowledge, Greenlight is a company that makes glass

24  pipes.

25  Q   Did the register ever fill up?

1  A    I'm sorry?

2  Q    Did the register ever fill up with cash?  Did you have to

3  remove the cash?

4  A    Yeah.  We had drops every now and then.  Most businesses

5  do.

6  Q    Okay.  And who had access to the drop safe?

7  A    Vindu and I believe Janet.

8  Q    And who's Janet?

9  A    Janet is one of -- another one of our employees.

10  Q    Okay.  Who else had access to that drop safe?

11  A    Nobody that I'm aware of.

12  Q    Did Mr. Sweeney have access to it?

13  A    I would assume so.

14          MR. LEAL:  Pass the witness.

15                     REDIRECT EXAMINATION

16  BY MR. FINSTROM:

17  Q    Now, sir, how big is that store?

18  A    It's fairly large.  It technically takes up four suites in

19  that complex.  Square footage wise, I wouldn't even really be

20  able to give you a ballpark.

21  Q    But it's a great big store; is that correct?

22  A    Yes.  And we --

23  Q    And there's a lot of products in the store?

24  A    There is a lot of products.  We do advertise it as the

25  largest shop in Texas.

1   Q    Okay.  And at one point they sold salvia; is that correct?

2   A    Correct.

3   Q    And you sold salvia?

4   A    That was prior to my employment there, but I did know -- I

5   was a customer at that point in time.

6   Q    Okay.  And salvia became illegal and they quit selling it;

7   is that correct?

8   A    Correct.

9   Q    Okay.

10          MR. FINSTROM:  We have no further questions, Your

11   Honor.

12          MR. LEAL:  Nothing further, Your Honor.

13          THE COURT:  You may step down.  Thank you.

14      (The witness steps down.)

15          MR. FINSTROM:  We would rest, Your Honor.

16          THE COURT:  Okay.

17          MR. LEAL:  The Government closes.

18          MR. FINSTROM:  Close, Your Honor.

19          THE COURT:  Okay.

20          MR. FINSTROM:  Thank you.

21          THE COURT:  Does either party wish to argue?

22          MR. LEAL:  Yes, just very briefly.  The Government

23   asks that the Court find probable cause and additionally the

24   Government would ask that the Court detain the Defendant.  He's

25   got a residence in Mexico.  He's got access to an account that

 1  there's been approximately $3 million deposited to.  He's

 2  facing time in federal prison.  And certainly, based upon his

 3  criminal history, the Government would argue that the Defendant

 4  should be detained based on the facts and circumstances before

 5  the Court.

 6          THE COURT:  Let me ask you a question.  I notice that

 7  the complaint says that this is a 240 -- I mean, sorry, an

 8  841(b) case.  (b).  841(b) case.  841(b)(1)(C) case.  Wait a

 9  minute.  Let me look at it again.

10          MR. LEAL:  Judge, that was in the body, in the body of

11  the affidavit, says --

12          THE COURT:  (b)(1)(B).  I'm sorry.  Go ahead.

13          MR. LEAL:  And that should be (b)(1)(C), Your Honor.

14          THE COURT:  (b)(1)(C)?

15          MR. LEAL:  Yes, Your Honor.

16          THE COURT:  And -- but I notice that you did not check

17  that it's a presumption case.  Is it a presumption case?

18          MR. LEAL:  It's a zero to 20 range, Your Honor, --

19          THE COURT:  Okay.

20          MR. LEAL:  -- is my understanding.  So I would, yeah,

21  I would argue that, yes, it is a presumption case, Your Honor.

22          THE COURT:  Okay.  I just didn't understand it because

23  it seemed inconsistent, so --

24          MR. LEAL:  Yes, Your Honor.

25          THE COURT:  -- I just wanted to clarify where we

1    stand.

2         MR. FINSTROM:  Your Honor, in the prior case whenever

3    he was requested to be in court he was in court.  He was facing

4    25 to life.  Really, a more serious case punishment-wise than

5    this one.  There were times where he was notified in Mexico the

6    day before to appear, and he got on an emergency flight and

7    appeared in court the following morning.  And at no point

8    during my representation of him has he ever made any attempt to

9    avoid responsibility or avoid going to court.

10       I think that the Court certainly has the power to request

11   his passport, limit him to North Texas, so he can operate a

12   business.

13       Officer Gardner's testimony about analogue substances and

14   my understanding of analogue substances is substantially

15   different.  I mean, it's a crazy business, but my perception is

16   that the head shops sell that stuff because it's their

17   perception that they can avoid, you know, the drug laws and

18   that they sell it believing it's legal, and customers buy it to

19   avoid the drug laws, thinking that it's legal.  And no one

20   who's not a chemist would be able to determine whether this

21   stuff was legal or not.  You've heard that there's no attempt

22   to tell Sweeney that it was illegal to sell the stuff, and I

23   think he certainly has stopped on that.  And the record that

24   the final witness said about salvia, when he was told quit

25   selling it, he quit selling it.

1    And I think he's a good bond risk.  He can operate a

2  business.  He can be in North Texas during the pendency of the

3  case.  I don't believe he'll avoid responsibility or going to

4  court, coming to court, and I'd ask the Court to consider bond.

5         THE COURT:  All right.  Think you, gentlemen.  And I

6  appreciate the case that you've presented here on behalf of

7  your client, Mr. Finstrom.

8    I disagree with you about the -- how the evidence appears

9  to me, and I guess I'm finding fact here regarding Mr.

10  Sweeney's knowledge.  You know, I'm sitting here, and of course

11  I hear cases that involve methamphetamine and cocaine and

12  marijuana that's not analogue, and something that is consistent

13  with drug traffickers when they traffic in those substances is,

14  first of all, that it's not open.  It's not open in the

15  situation here, based on the evidence I heard, is that although

16  the Knock Out was 65 to 70 percent of the sales, it was kept

17  hidden in behind the counter or was kept out of sight and

18  locked up.

19    That's really inconsistent in my view with believing that

20  it's okay.  Inconsistent in my view with believing that it's

21  okay is having to change suppliers because one supplier is shut

22  down and then having to change suppliers again because another

23  supplier is shut down by law enforcement.  Inconsistent in my

24  opinion with that also is the fact that you're purchasing

25  property or whatever else using large sums of cash rather than,

1    as people who are engaged in legitimate businesses do, checks

2    and maintaining a checking account and paying for things that

3    way.  And having to use cash and having to use money orders and

4    having to carry big sums of cash and money counters is

5    inconsistent with believing it's a legitimate business in my

6    view.  Purchasing real property and putting it into the names

7    of third parties is consistent with what methamphetamine,

8    cocaine, marijuana, heroin and other drug traffickers do.

9        In this case, I do find probable cause to believe that the

10   offense alleged -- that Mr. Sweeney committed the offense

11   alleged in the criminal complaint, which as you know gives rise

12   to a presumption under the law that there is no condition or

13   combination of conditions I could impose which would reasonably

14   assure his appearance as required.

15       Now, I will tell you that but for the fact that Mr. Sweeney

16   has a long and extensive criminal history, and but for the fact

17   that he has no stable residence in this case, and that

18   basically his business, for all practical purposes, doesn't

19   exist the way his business existed here, and the fact that he

20   has strong ties, including real estate, a home, what he

21   considers a home, as well as financial resources in Mexico,

22   lead me to believe that the Government, even though you've

23   presented evidence to rebut that presumption, the Government

24   has carried its burden by a preponderance of the evidence to

25   establish that there are no conditions or combination of

1   conditions I could impose which would reasonably assure Mr.

2   Sweeney's appearance as required in this case.  And so that's

3   going to be my finding.

4       And I understand perfectly what you're saying about the

5   analogue, you know, and the substance and when and if it's

6   illegal.  Just based on what I have before me, I do have to

7   find probable cause.  You know what that standard is.  And of

8   course, down the road when it's appropriate you will have the

9   opportunity, of course, to challenge whether or not there is

10  actually an offense that's been committed in this case.  But I

11  have to go with the charge that I have as well as the evidence

12  that's presented to me.  And for that reason, I'm going to

13  order that Mr. Sweeney be detained in this case.

14      Is there anything else, then, we need to do in this case

15  this afternoon?

16          MR. LEAL:  Nothing from the Government, Your Honor.

17          MR. FINSTROM:  No, Your Honor.

18          THE COURT:  Then we are adjourned, gentlemen.

19      (Proceedings concluded at 3:44 p.m.)

20                      --oOo--

21                     CERTIFICATE

22      I certify that the foregoing is a correct transcript from
    the digital sound recording of the proceedings in the above-
23  entitled matter.

24

25  _____     _____

    Kathy Rehling, CET**D-444                    Date
    Certified Electronic Court Transcriber

1                                    INDEX

2   PROCEEDINGS                                              3

3   WITNESSES

4   Government's Witnesses

5   Richard Gardner
6   - Direct Examination by Mr. Leal                        3
    - Cross-Examination by Mr. Finstrom                    19
7   - Redirect Examination by Mr. Leal                     28

8   Defendant's Witnesses

9   Sherry Thomas
    - Direct Examination by Mr. Finstrom                   31
10  - Cross-Examination by Mr. Leal                        35

11  Vindu Chauhan
    - Direct Examination by Mr. Finstrom                   39
12  - Cross-Examination by Mr. Leal                        44
    - Redirect Examination by Mr. Finstrom                48
13  - Recross-Examination by Mr. Leal                      49

14  Ryan Burnight
    - Direct Examination by Mr. Finstrom                   50
15  - Cross-Examination by Mr. Leal                        51
16  - Redirect Examination by Mr. Finstrom                57

17  EXHIBITS

18  -none-

19  RULINGS

20  Findings                                              61
    Probable Cause Found                                  62
21  Defendant Ordered Detained                            63

22  END OF PROCEEDINGS                                     63

23  INDEX                                                 64

24

25